Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Bradley K. King (SBN 274399)
*bking@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| THEODORE HART, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BELKIN INTERNATIONAL, INC.,<br><br>Defendant. | Case No. 2:26-cv-06407<br><br>**CLASS ACTION COMPLAINT**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Theodore Hart ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Belkin International, Inc. ("Belkin" or "Defendant"). Plaintiff brings this class action based upon personal knowledge of the facts pertaining to himself and, as to all other matters, on information and belief based on the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a consumer class action arising from Defendant Belkin International, Inc.'s ("Belkin" or "Defendant") decision to unilaterally disable essential functionality of dozens of its Wemo smart home products years after selling those products to consumers who paid a premium for their connected capabilities. By terminating the cloud infrastructure and application support necessary for these products to operate as advertised, Belkin substantially impaired the functionality and value of products that consumers reasonably expected would continue to function as smart home devices.

2. For years, Belkin marketed Wemo as a connected smart home ecosystem that allowed consumers to remotely monitor, automate, schedule, and control devices throughout their homes. Belkin represented that consumers could "control and automate things around your home" through internet-connected technology and touted compatibility with major voice assistants, including Amazon Alexa and Google Assistant. These capabilities were not incidental features, but were the very reason consumers purchased Wemo products and paid prices significantly higher than comparable non-smart alternatives.

3. Consumers did not purchase ordinary electrical switches, plugs, motion sensors, or household appliances. They purchased products marketed and sold as components of an integrated ecosystem that depended upon Belkin's software, cloud services, and application support to deliver remote access, automation, scheduling, and voice control. The continued availability of those services was fundamental to the value of the products Belkin sold.

4. On or about July 10, 2025, however, Belkin announced that it would "discontinue Wemo cloud services and app support for select Wemo products effective January 31, 2026."[1] Belkin further informed consumers that, after that date, "the Wemo app and all cloud-based features—including remote access and voice assistant integrations (Amazon Alexa, Google Assistant)—will no longer function for affected products."

5. In other words, Belkin did not merely stop providing customer support for legacy products. It affirmatively eliminated functionality that consumers had already purchased. Products marketed and sold as "smart" devices would no longer perform many of the functions that distinguished them from substantially less expensive conventional alternatives. Consumers who purchased these products for their connected capabilities were left with devices that no longer operated as represented at the time of sale.

6. Upon information and belief, Belkin knew or should have known that consumers purchased Wemo products because of their cloud-enabled functionality and ecosystem integration. Belkin likewise knew or should have known that terminating those services would materially diminish the products' usefulness and market value. Yet Belkin failed to adequately disclose, at or before the time of sale, that it could later discontinue the very infrastructure necessary for the products to function as advertised, thereby substantially impairing their value years after consumers made their purchases.

7. The injury suffered by Plaintiffs and the Class is neither speculative nor abstract. Plaintiffs and Class members paid a premium for internet-connected products capable of remote control, automation, scheduling, and integration with third-party smart home platforms. Following Belkin's decision, they were deprived of a substantial portion of the benefit of their bargain and forced either to accept materially diminished products or incur additional expense to purchase replacement devices that restore the functionality Belkin removed.

---

[1] Belkin Int'l, Inc., *Wemo Support Ending – What You Need to Know*, BELKIN, https://www.belkin.com/support-article/?articleNum=335419 (last visited June 9, 2026).

8. This case concerns more than the discontinuation of a software application. It concerns whether a manufacturer may induce consumers to purchase products by emphasizing cloud-based functionality and ecosystem integration, retain the economic benefit of those sales, and then later unilaterally disable the very features that made the products valuable in the first place.

9. Plaintiff therefore brings this action on behalf of himself and all other similarly situated consumers seeking damages, restitution, injunctive relief, and all other remedies available under federal and state law arising from Belkin's unfair, deceptive, and unlawful conduct.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Belkin is a citizen of a State different from that of at least one Class member.

11. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

12. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Belkin’s principal place of business is located in this District and substantial parts of the events or omissions giving rise to the claims occurred in the District. Venue is also proper in this Court because Belkin is located here, the causes of action arose here, and the Products at issue here were, at least in part, designed, and tested by Belkin in this District.

## III. PARTIES

13. Plaintiff Theodore Hart is a citizen of the State of Maryland, and resides in Howard County, Maryland. Plaintiff has purchased multiple Belkin Wemo products for personal, family, and household use. Specifically, Plaintiff purchased one Wemo Switch from Amazon on or about October 19, 2016. Plaintiff also purchased two additional Wemo® Switches, model F7C027fc, through Belkin.com on or about December 31, 2016.

Plaintiff purchased Wemo products because of the smart-home functionality Belkin advertised, including their ability to connect to and operate through voice assistants and other connected technologies. Plaintiff used the products with Amazon Alexa.

14. The connected functionality of the products was material to Plaintiff's purchasing decision. Plaintiff sought smart devices that offered automation, remote control, scheduling, voice-assistant integration, and the ability to control or schedule lights while away from home, capabilities that distinguished the products from conventional switches and plugs. Plaintiff reasonably relied upon Belkin's representations that the Wemo products functioned as part of a connected smart-home ecosystem and possessed the remote connectivity and interoperability that Belkin marketed.

15. Plaintiff's Wemo products functioned as expected until Belkin announced and implemented the discontinuation of cloud services and support for affected Wemo products, after which the products no longer connected properly to voice activation and other smart functionality. As a result of the discontinuation, Plaintiff's devices no longer perform the connected functions for which they were purchased. Plaintiff would not have purchased the products, or would have paid substantially less for them, had Defendant disclosed that it could later discontinue the software and cloud infrastructure necessary for the products' principal advertised functionality.

16. Defendant Belkin International, Inc. is a corporation organized and existing under the laws of the State of Delaware with its place of business located at 555 Aviation Blvd., Suite 180, El Segundo, California 90245.

## IV. FACTUAL ALLEGATIONS

### A. Belkin Marketed Wemo as a Connected Smart Home Ecosystem

17. Belkin is a global consumer electronics company that designs, manufactures, markets, and sells connectivity, networking, and home automation products throughout the United States and internationally.[2] Belkin describes itself as an "accessories market leader

---

[2] *See* Belkin Int'l, Inc., *About Belkin International*, BELKIN, https://www.belkin.com/us/about-us/ (archived May 14, 2022, via Internet Archive

delivering power, protection, productivity, connectivity, audio, security and home automation solutions" that are "designed in Southern California and sold in more than 50 countries around the world."[3]

18. Through its Wemo brand, Belkin entered the rapidly growing smart-home market by developing internet-connected products designed to automate and remotely control numerous functions within consumers' homes.

19. Unlike conventional household products, Wemo devices were not marketed as standalone pieces of hardware. Rather, Belkin designed and sold them as components of an integrated ecosystem consisting of physical devices, proprietary software, mobile applications, cloud infrastructure, and compatibility with third-party smart-home platforms.

20. Belkin's own description of Wemo demonstrates the nature of the products it sought to sell:

> "Our legacy is built on connections, from the people who occupy their homes to the devices that serve them within. Wemo by Belkin creates and curates a collection of smart household technology which work together to make your house a home."[4]

21. Belkin further represented:

> "No matter how smart our technology gets, we know that home should be human, so we design everything to be simple, intuitive and non-intrusive. Wemo works to keep every home connected, safe and entertained."[5]

---

Wayback Machine), https://web.archive.org/web/20220514041035/https://www.belkin.com/us/about-us/ (last visited June 10, 2026).

[3] *Id.*

[4] Belkin Int'l, Inc., *Wemo Smart Home*, BELKIN (archived Nov. 28, 2023), https://web.archive.org/web/20231128232459/https://www.belkin.com/products/wemo-smart-home/ (last visited June 10, 2026).

[5] *Id.*

22. These statements reflect Belkin's strategy: consumers were encouraged to purchase a connected ecosystem in which multiple devices would "work together" to create an integrated smart-home experience.[6]

**B. Belkin Promised Connectivity, Automation, and Remote Control**

23. Belkin consistently marketed Wemo products based on connectivity and automation rather than the hardware's physical characteristics.

24. For example, Belkin represented that advances in smart-home technology allowed consumers to connect and control "lights, appliances, and everyday essentials faster and easier than ever."[7]

25. Belkin explained that its Thread technology was "[d]esigned specifically for smart accessories" and "offers a separate network just for those connected items."

26. Belkin further emphasized the scope and success of the Wemo platform, stating: "[f]rom our Los Angeles-based global headquarters, Wemo has been making people's lives a little easier since 2012. We've been welcomed into 3.4 million homes in more than 200 countries worldwide."

27. Belkin also represented: "Wemo is the award-winning home automation and IoT brand that's part of Belkin International. We make setting up a smart home simple, with the integration of modern technology and ease of use. Wemo users can control their lights and appliances from anywhere with Apple HomeKit."[8]

28. Belkin's representations emphasized that consumers could remotely access and control devices, create automated routines, and integrate multiple products into a unified smart-home ecosystem.

---

[6] *Id.*

[7] Belkin Int'l, Inc., *All You Need to Know About Thread Mesh Network*, BELKIN (archived May 18, 2022), https://web.archive.org/web/20220518184806/https://www.belkin.com/us/resource-center/thread-networking-2022-mesh-technology-for-smart-homes-and-devices/ (last visited June 10, 2026).

[8] *Id.*

29. Belkin likewise promoted compatibility with third-party platforms, including Apple HomeKit, Amazon Alexa, and Google Assistant, thereby increasing the functionality and value of Wemo products.

30. These representations were material because they distinguished Wemo products from conventional switches, plugs, and appliances and justified the premium prices consumers paid.

**C. Consumers Bought Smart Functionality, Not Merely Hardware**

31. Consumers did not purchase ordinary electrical switches, plugs, dimmers, or household appliances. They purchased products marketed as internet-connected smart devices capable of remote access, automation, scheduling, and interoperability.

32. The defining characteristic of a Wemo smart device was its ability to communicate through Belkin's software platform and cloud infrastructure, allowing consumers to remotely control devices, automate household functions, and integrate with other smart-home technologies.

33. Belkin marketed these capabilities as principal features of the products and charged premium prices accordingly. Comparable conventional electrical products lacking these capabilities were widely available at substantially lower prices. Consumers nevertheless paid more for Wemo products because they expected to receive the additional functionality Belkin advertised.

34. Upon information and belief, Belkin understood that consumers were purchasing participation in a continuing connected ecosystem rather than merely acquiring discrete pieces of hardware.

35. Belkin encouraged consumers to expand their investment by purchasing multiple Wemo devices capable of operating together through a unified platform. As consumers added devices, the value of the ecosystem increased because products could be integrated into common routines, schedules, and smart-home automations.

**D. Belkin Retained Exclusive Control Over Core Product Functions**

36. The functionality of many Wemo products depended upon software applications and cloud services owned, maintained, and controlled exclusively by Belkin.

37. Plaintiff and Class members had no practical ability to independently maintain, replace, or duplicate the cloud infrastructure necessary for those products to perform many of their advertised functions.

38. Consequently, Belkin retained exclusive authority over whether remote access, automation, application support, scheduling functions, and third-party integrations would continue to operate.

39. Belkin likewise retained the unilateral ability to materially alter the functionality and value of products already sold into the marketplace.

40. Plaintiff and Class members reasonably expected that products marketed as smart-home devices would continue to perform their principal advertised functions throughout their ordinary useful lives absent physical failure or misuse.

41. Nothing disclosed to consumers, through its advertising and marketing materials, reasonably suggested that Belkin could later terminate the infrastructure necessary for the products to function as represented.

**E. Belkin Announced It Would Shut Down Essential Services and Support**

42. On or about July 10, 2025, Belkin publicly announced that it would "discontinue Wemo cloud services and app support for select Wemo products effective January 31, 2026."[9]

43. According to Belkin's announcement, "[t]he Wemo app and all cloud-based features—including remote access and voice assistant integrations (Amazon Alexa, Google Assistant)—will no longer function for affected products."[10]

---

[9] Belkin Int'l, Inc., *Wemo Support Ending – What You Need to Know*, BELKIN, https://www.belkin.com/support-article/?articleNum=335419 (last visited June 10, 2026).

[10] *Id.*

44. Belkin additionally advised consumers that:

a. the Wemo cloud service would be shut down;

b. the Wemo application would no longer function or receive updates; and

c. new setup or reconfiguration through the Wemo application or HomeKit would no longer be possible after the shutdown date.[11]

45. Belkin's statements admit that cloud infrastructure was essential for the functioning of the affected products.

46. Belkin's announcement did not merely discontinue customer support or future software development. Rather, Belkin announced that functionality consumers had already purchased would cease because Belkin unilaterally decided to shut down the infrastructure necessary to provide it.

47. The decision was entirely within Belkin's control. Plaintiff and Class members possessed no practical ability to preserve or replace the cloud services upon which their products depended.

### F. Belkin's Shutdown Stripped Wemo Products of Core Functionality and Value

48. While the affected products remained physically intact, their functionality and value significantly diminished as a result of Belkin's decision to discontinue software and cloud services. Indeed, once Belkin terminated those services, affected products lost many of the capabilities that distinguished them from substantially less expensive conventional alternatives.

49. Consumers who purchased Wemo products because of their remote access, automation, scheduling, and voice-assistant functionality no longer possessed products capable of performing many of those functions.

---

[11] *See* Belkin Int'l, Inc., *Wemo Support Ending – What You Need to Know*, BELKIN, https://www.belkin.com/support-article/?articleNum=335419 (last visited June 10, 2026).

50. Belkin therefore altered the practical functionality of products already sold by eliminating infrastructure that it alone controlled.

51. The economic consequences of Belkin's decision were foreseeable. A consumer who paid a premium for a connected smart device did not receive the benefit of that bargain when essential cloud-based functionality was later eliminated.

52. Consumers seeking to restore equivalent smart-home functionality must purchase replacement devices or reconstruct previously integrated smart-home systems despite the fact that their existing hardware remains physically operational.

53. Belkin has acknowledged that only certain products still under warranty "may be eligible for a refund," subject to proof-of-purchase requirements and other limitations. However, this limited refund program does not compensate many consumers whose products have lost substantial value because of Belkin's decision to terminate the ecosystem upon which they depended.

**G. Belkin Knew of the Shutdown Risk and Failed to Disclose It**

54. At all relevant times, Belkin possessed superior knowledge regarding the architecture and operation of the Wemo ecosystem and the extent to which the products depended upon cloud infrastructure exclusively within Belkin's control.

55. Plaintiff and Class members lacked access to that information and had no reasonable means of determining whether the products' principal functionality depended upon services that Belkin could later discontinue through a unilateral business decision.

56. Belkin knew that consumers, including Plaintiff and Class members, purchased Wemo products because of their advertised smart-home capabilities and that those capabilities materially influenced purchasing decisions. Belkin further knew that eliminating cloud services would materially diminish the products' functionality and market value.

57. A reasonable consumer would consider it important to know that the manufacturer retained the unilateral ability to terminate the software and cloud infrastructure necessary for remote access, automation, scheduling, and voice-assistant

integration. Had Belkin adequately disclosed that it could later discontinue those services during the expected useful life of the products, reasonable consumers would have paid substantially less for the products or would not have purchased them at all.

## V. CLASS ACTION ALLEGATIONS

58. Plaintiff brings this action individually, and on behalf of all members of the following Classes (together, the "Class" or "Classes") of similarly situated persons:

> **Nationwide Class**
> All citizens of the United States who purchased one or more affected Wemo products for personal, family, or household use during the applicable limitations period and whose products were subject to Belkin's announced termination of Wemo cloud services and application support effective January 31, 2026.
>
> **Maryland Subclass**
> All citizens of the State of Maryland who purchased one or more affected Wemo products for personal, family, or household use during the applicable limitations period and whose products were subject to Belkin's announced termination of Wemo cloud services and application support effective January 31, 2026.

59. The "Nationwide Class" and "Maryland Subclass" are referred to herein as the "Class." Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

60. Plaintiff reserves the right to modify or amend the definition of the proposed Class, before the Court determines whether certification is appropriate.

61. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same

evidence as would be used to prove those elements in individual actions alleging the same claims.

62. Numerosity. The Class members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class members are unknown at this time, based on information and belief, the Class consists of hundreds of thousands or millions of Class members, making joinder impracticable. Those individuals' identities are available through Defendant's records, and Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

63. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant marketed Wemo products as connected smart-home devices;

b. Whether Defendant represented that Wemo products would function as part of an integrated ecosystem;

c. Whether cloud services and software support constituted material components of the products sold and whether Defendant retained exclusive control over those services;

d. Whether Defendant failed to disclose that it could later terminate infrastructure necessary for the products' advertised functionality;

e. Whether Defendant's discontinuation of cloud services materially diminished the value of affected products;

f. Whether Plaintiff and Class members paid a price premium attributable to the Wemo products' smart-home capabilities;

g. Whether Defendant's conduct violated applicable consumer protection statutes and common law;

h. whether Plaintiffs and Class Members suffered economic injury; and

i. the appropriate measure of damages, restitution, and equitable relief.

64. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

65. Typicality. Plaintiffs' claims are typical of those of other Class members because, like every Class member, Plaintiff purchased Wemo products marketed as connected smart-home devices and suffered economic injury when Belkin terminated the cloud services necessary for many of the products' principal advertised functions. Plaintiff's claims are typical of those of the other Class members because, *inter alia*, all Class members were injured through the common misconduct of Belkin. Plaintiff is advancing the same claims and legal theories on behalf of Plaintiff and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class members arise from the same operative facts and are based on the same legal theories.

66. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class members. Plaintiff's counsel are competent and experienced in litigating class actions related to consumer protections.

67. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class members by marketing Wemo products as connected smart-home devices, failing to disclose that it retained the unilateral ability to terminate the software and cloud infrastructure necessary for many of the products' principal advertised functions, and then discontinuing those services in a manner that materially impaired product functionality and value. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

68. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be

encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

69. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

70. Finally, all members of the proposed Class are readily ascertainable. Belkin has access to the names and addresses and/or email addresses of Class members since Belkin requires a user to create an account in order to use the Wemo app and cloud services.

## VI. CAUSES OF ACTION

### COUNT I

**Violations of California's False and Misleading Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

71. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

72. California's False Advertising Law ("FAL") prohibits any person or entity from making or disseminating any statement concerning real or personal property or services that is untrue or misleading and that is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

73. At all relevant times, Defendant developed, marketed, distributed, and sold Wemo products through uniform advertising campaigns, product descriptions, packaging,

websites, promotional materials, and retailer listings originating from its California headquarters. Those representations were directed to consumers throughout the United States, including Plaintiff and Class members.

74. Defendant affirmatively represented that Wemo products constituted a connected smart-home ecosystem that would allow consumers to remotely control household devices, automate routines, integrate with third-party platforms such as Apple HomeKit, Amazon Alexa, and Google Assistant, and create an interconnected home environment. Defendant further represented that Wemo products "work together" and "keep every home connected," thereby conveying to reasonable consumers that the products possessed continuing internet-connected functionality.

75. These representations were material because the connected functionality constituted the principal feature distinguishing Wemo products from substantially less expensive conventional switches, plugs, and household devices. Consumers, including Plaintiff and Class members, paid a premium for those capabilities.

76. Defendant knew, or in the exercise of reasonable care should have known, that the products' principal advertised functionality depended upon software and cloud infrastructure exclusively controlled by Defendant and that Defendant retained the unilateral ability to discontinue that infrastructure and thereby eliminate many of the products' principal advertised functions.

77. Despite that knowledge, Defendant failed to disclose that it could terminate the software and cloud services necessary for remote access, automation, scheduling, interoperability, and voice-assistant integration. Instead, Defendant marketed the products as components of a continuing connected ecosystem while omitting material facts necessary to make its representations not misleading.

78. Reasonable consumers would attach importance to the omitted information in deciding whether to purchase the products and how much to pay for them. Had Plaintiff and Class members known that Defendant could later terminate the infrastructure necessary

for the products' defining functionality, they would have paid substantially less for the products or would not have purchased them.

79. Defendant's advertising was likely to deceive, and did deceive, reasonable consumers.

80. As a direct and proximate result of Defendant's violations of the FAL, Plaintiff and Class members suffered injury in fact and lost money and property, including but not limited to overpayment, diminution in value, loss of the benefit of the bargain, and replacement costs.

81. Plaintiff therefore seeks restitution, injunctive relief, declaratory relief, attorneys' fees and costs where authorized by law, and such other relief as the Court deems just and proper.

**COUNT II**
**Violations of California’s Unfair Competition Law (“UCL”),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

82. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

83. Defendant is a “person” as defined by Cal. Bus. & Prof. Code § 17201.

84. The California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, et seq. (“UCL”), prohibits any “unlawful,” “fraudulent” or “unfair” business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law. Defendant violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

85. The acts, omissions, and conduct complained of herein in violation of the UCL were designed and emanated from Defendant’s California corporate office.

86. The acts, omissions, and conduct of Defendant as alleged herein constitute a “business practice” within the meaning of the UCL.

**Unlawful Prong**

87. Defendant has engaged in “unlawful” business practices by violating multiple laws, including the False and Misleading Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.; trespass to chattels; breach of contract; breach of the duty of good faith and fair dealing; and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.*

**Fraudulent Prong**

88. Defendant violated Cal. Bus. & Prof. Code § 17200’s prohibition against “fraudulent” conduct by marketing Wemo products as components of a connected smart-home ecosystem while failing to adequately disclose that Defendant retained the unilateral ability to terminate the infrastructure necessary for many of the products' principal advertised functions. Defendant’s representations and omissions were likely to mislead reasonable consumers and did mislead them. Plaintiff and Class members reasonably relied upon Defendant's marketing and omissions and were thereby induced to purchase the products and pay premium prices.

**Unfair Prong**

89. Defendant’s conduct violates the “unfair” prong of the UCL. Defendant's conduct is substantially injurious to consumers like Plaintiff and other Class members, offends public policy, is immoral, unethical, oppressive, and unscrupulous because the substantial harm to consumers outweighs any utility associated with Defendant's conduct and because consumers could not reasonably have avoided that harm. Defendant marketed and sold products whose principal value depended upon software and cloud infrastructure under Defendant's exclusive control while failing to adequately disclose that Defendant could later discontinue those services and materially diminish the products' functionality.

90. Defendant engaged in this conduct at the expense of its customers’ rights when there are other reasonably available alternatives to further its legitimate business interests such as providing customers with full information about the Wemo products.

91. As a result of Defendant's violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, as detailed herein. Plaintiff and Class members purchased Wemo products and transacted with Defendant.

92. Monetary damages and other legal remedies are inadequate to address Belkin's wrongful practices described in this complaint. Among other reasons, such remedies would not end Belkin's wrongful practices. Plaintiff is entitled to injunctive relief to address Defendant's wrongful conduct. Plaintiff further seeks any additional equitable relief to which he may be entitled.

**COUNT III**

**Violation of the Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law §§ 13-101 *et seq.***
**(On Behalf of Plaintiff and the Maryland Subclass)**

93. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

94. This cause of action is brought on behalf of Plaintiff and the proposed Maryland Subclass pursuant to the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 et seq.

95. The MCPA prohibits unfair, abusive, and deceptive trade practices in the sale and advertisement of consumer goods and is intended to protect consumers from false and misleading representations and material omissions.

96. At all relevant times, Defendant marketed, advertised, distributed, and sold Wemo products to consumers, including Plaintiff and members of the Maryland Subclass, through uniform marketing materials, product descriptions, websites, packaging, and retailer listings.

97. Defendant represented that Wemo products were connected smart-home devices capable of remote access, automation, interoperability, scheduling, and integration with third-party smart-home platforms. Defendant further represented that Wemo products functioned as components of a unified ecosystem that would allow consumers to control and automate their homes through internet connectivity.

98. These representations were material because they constituted the principal features that distinguished Wemo products from conventional household devices and justified the premium prices consumers paid.

99. Defendant omitted material facts concerning the products, including that many of their principal advertised functions depended upon software and cloud infrastructure exclusively controlled by Defendant and that Defendant retained the unilateral ability to discontinue that infrastructure after consumers had purchased the products.

100. Defendant knew, or reasonably should have known, that reasonable consumers would consider this information important in deciding whether to purchase the products and how much to pay for them.

101. By failing to disclose these material facts while simultaneously emphasizing the products' connected capabilities, Defendant engaged in unfair and deceptive trade practices prohibited by the Maryland Consumer Protection Act.

102. Plaintiff reasonably relied upon Defendant's representations and omissions when purchasing the affected Wemo products. Had Plaintiff known that Defendant could later terminate the cloud services and software necessary for many of the products' defining functions, Plaintiff would not have purchased the products or would have paid substantially less for them.

103. Defendant subsequently exercised its exclusive control over the Wemo ecosystem by discontinuing cloud services and application support, materially reducing the functionality and value of the affected products.

104. As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and members of the Maryland Subclass suffered ascertainable losses, including but not limited to: overpayment for the products, diminution in the products' value, loss of the benefit of the bargain, and costs associated with replacing affected products.

105. Defendant's conduct was knowing, willful, and part of a uniform course of conduct directed toward consumers, including consumers residing in Maryland.

106. Accordingly, Plaintiff and the Maryland Subclass are entitled to recover all damages, restitution, equitable relief, attorneys' fees, costs, and such other relief as permitted under the Maryland Consumer Protection Act and applicable law.

## COUNT IV

### Breach of Contract
### (On Behalf of Plaintiff and the Nationwide Class)

107. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

108. Plaintiff and Class members entered into valid and enforceable contracts with Defendant through their purchases of Wemo products.

109. The terms of those contracts included not only the payment of the purchase price and delivery of the physical products, but also Defendant's representations regarding the products' characteristics, functionality, capabilities, packaging, product descriptions, advertising, and accompanying documentation.

110. Defendant represented that Wemo products were connected smart-home devices capable of remote access, automation, scheduling, interoperability, and integration with third-party smart-home platforms. Defendant further represented that Wemo products functioned as components of a unified ecosystem designed to allow consumers to control and automate their homes through internet connectivity.

111. These representations formed part of the basis of the bargain between Defendant and Plaintiff and Class members.

112. Plaintiff and Class members fully performed all obligations required of them under the contracts by purchasing the products and paying the agreed-upon purchase price.

113. Defendant, however, failed to perform its obligations. Rather than providing products with the functionality Defendant promised and for which consumers paid a premium, Defendant unilaterally elected to discontinue the software and cloud infrastructure necessary for many of the products' principal advertised functions.

114. As Defendant has acknowledged, following the termination of its cloud services, the Wemo application and numerous cloud-based features—including remote access and voice assistant integrations—would no longer function for affected products.

115. Defendant's actions materially altered the products purchased by Plaintiff and the Class and deprived them of significant functionality that constituted an essential component of the parties' bargain.

116. The breach was not the result of hardware failure, misuse, or ordinary wear and tear. Instead, it resulted from Defendant's own affirmative business decision to terminate infrastructure exclusively within its control.

117. At all relevant times, Defendant possessed the exclusive ability to maintain the software and cloud services necessary for the products to perform as represented. Plaintiff and Class members had no practical ability to preserve or replace those services independently.

118. As a direct consequence of Defendant's conduct, Plaintiff and Class members were deprived of the benefit of their bargain. They paid premium prices for products marketed as connected smart-home devices but received products whose functionality and value were materially diminished through Defendant's unilateral actions.

119. As a direct and proximate result of Defendant's breach, Plaintiff and Class members have suffered damages, including but not limited to: overpayment for the products, diminution in the products' value, loss of the benefit of the bargain, and costs associated with replacing affected products or restoring lost functionality.

120. Plaintiff and Class members are therefore entitled to recover compensatory damages, prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

///

///

///

///

## COUNT V

**Breach of the Implied Covenant of Good Faith and Fair Dealing (On Behalf of Plaintiff and the Nationwide Class)**

121. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

122. In every contract or agreement there is an implied promise of good faith and fair dealing under California law.

123. As described herein, contracts with California choice of law provisions govern the agreements between Belkin and its customers.

124. Every contract contains an implied covenant of good faith and fair dealing requiring that neither party do anything that will unfairly interfere with the right of the other party to receive the benefits of the agreement.

125. Plaintiff and Class members entered into agreements with Defendant through their purchases of Wemo products. Those agreements carried with them an implied covenant that Defendant would not exercise any discretion it possessed in a manner that would deprive purchasers of the essential benefits of their bargain.

126. The central benefit of the bargain was not merely ownership of physical switches, plugs, or other hardware. Rather, Defendant marketed and sold Wemo products as components of an integrated smart-home ecosystem capable of remote access, automation, scheduling, interoperability, and compatibility with widely used third-party platforms.

127. Defendant encouraged consumers to invest in that ecosystem by purchasing multiple Wemo devices designed to function together through Defendant's software and cloud infrastructure.

128. Defendant retained exclusive control over the software and cloud services necessary for many of those functions. Plaintiff and Class members had no practical ability to maintain, replace, or replicate that infrastructure independently.

129. Although Defendant may have retained discretion regarding the operation and maintenance of its software and cloud services, that discretion was constrained by the implied covenant of good faith and fair dealing. Defendant could not exercise that discretion in a manner that would destroy or substantially impair the benefits that consumers reasonably expected to receive from their purchases.

130. Nevertheless, Defendant unilaterally discontinued the software and cloud infrastructure necessary for many of the products' principal advertised functions, including remote access, automation, and voice-assistant integration.

131. As a result, products that remained physically operational lost significant functionality and value solely because of Defendant's affirmative business decision.

132. Defendant's conduct frustrated the fundamental purpose of the parties' agreements and deprived Plaintiff and Class members of the fruits of their contracts.

133. Defendant acted knowingly and intentionally. Defendant understood that consumers had purchased Wemo products because of their connected capabilities and that terminating the supporting infrastructure would materially diminish those capabilities and reduce the value of the products.

134. Rather than preserving the benefits reasonably expected by purchasers, Defendant exercised its exclusive control over the Wemo ecosystem in a manner that unfairly shifted the economic consequences of its business decision onto consumers who had already paid premium prices for the products.

135. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members have suffered damages.

136. Plaintiff and Class members are therefore entitled to recover all damages available at law, together with prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

**COUNT VI**
**Trespass To Chattels**
**(On Behalf of Plaintiff and the Nationwide Class)**

137. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

138. At all relevant times, Plaintiff and Class members lawfully purchased, owned, and possessed the affected Wemo products.

139. Those products constitute tangible personal property, and Plaintiff and Class members possess a legally protected possessory interest in them.

140. When Plaintiff and Class members purchased their Wemo products, the products possessed the functionality represented by Defendant, including remote access, automation, scheduling, interoperability, and integration with supported smart-home platforms.

141. Defendant, however, retained exclusive control over the software, cloud infrastructure, authentication systems, and related services necessary for many of those functions to operate.

142. Plaintiff and Class members could not independently maintain, replace, or replicate those services. Instead, Defendant alone possessed the ability to enable, maintain, modify, or terminate them.

143. After consumers had purchased and integrated the products into their homes, Defendant intentionally exercised that continuing control by discontinuing the software and cloud services necessary for many of the products' principal advertised functions.

144. As a direct consequence of Defendant's affirmative conduct, affected Wemo products lost substantial functionality, including cloud-based remote access and other integrated smart-home capabilities.

145. Defendant's conduct was intentional. The resulting impairment was not accidental, nor was it caused by hardware failure, misuse, ordinary wear and tear, or actions undertaken by Plaintiff or members of the Nationwide Class. Rather, it resulted from

Defendant's deliberate business decision to terminate infrastructure exclusively within its control.

146. By intentionally causing the products to lose substantial functionality after they had been sold, Defendant intentionally interfered with Plaintiff's and the Nationwide Class's possessory interests in their personal property.

147. Defendant's interference substantially impaired the condition, quality, usefulness, and value of the affected products. Products that had been marketed and purchased as connected smart-home devices were transformed into products materially different from those consumers had purchased and materially less valuable than before Defendant's actions.

148. The interference was significant and measurable. Among other things, Plaintiff and Class members suffered: diminution in the value of their property; loss of use and enjoyment of significant product functionality; impairment of previously existing smart-home integrations and automations; and costs associated with replacing affected products or restoring lost functionality.

149. Defendant knew or reasonably should have known that terminating the software and cloud infrastructure would materially impair the functionality and value of products already owned by consumers.

150. Defendant nevertheless intentionally proceeded with that course of conduct, substantially interfering with Plaintiff's and the Nationwide Class's possessory interests in their personal property.

151. As a direct and proximate result of Defendant's trespass to chattels, Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to all available legal and equitable relief.

///

///

///

///

## COUNT VII
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

152. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

153. This cause of action is pleaded in the alternative to Plaintiff's contract-based claims pursuant to Rule 8(d) of the Federal Rules of Civil Procedure.

154. At all relevant times, Defendant designed, marketed, distributed, and sold Wemo products as components of an integrated smart-home ecosystem possessing valuable connected functionality, including remote access, automation, scheduling, interoperability, and compatibility with third-party smart-home platforms.

155. Defendant represented that these connected capabilities materially distinguished Wemo products from conventional household devices and induced consumers to pay premium prices for those products.

156. Relying upon Defendant's representations and omissions, Plaintiff and Class members purchased Wemo products and thereby conferred substantial monetary benefits upon Defendant.

157. Defendant knowingly accepted and retained those benefits.

158. The value conferred upon Defendant was not merely the purchase price of physical hardware. Rather, Defendant received the economic benefit of selling products represented as connected smart-home devices whose value depended upon software, cloud infrastructure, and ecosystem integration.

159. After receiving those benefits, Defendant exercised its exclusive control over the software and cloud infrastructure necessary for many of the products' principal advertised functions and elected to discontinue that infrastructure.

160. As a direct consequence of Defendant's actions, Plaintiff and Class members were deprived of substantial portions of the functionality for which they had paid, while Defendant retained the premium it had obtained by marketing those very capabilities.

161. Defendant has therefore received and retained benefits under circumstances that make its retention inequitable and unjust.

162. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered economic injury and damages.

163. Equity and good conscience require that Defendant disgorge the benefits it unjustly obtained and make restitution to Plaintiff and the Class.

164. Accordingly, Plaintiff and Class members seek restitution, disgorgement, equitable relief, prejudgment interest, costs of suit, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other Class members, seeks the following relief:

A. Certifying the class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Judgment in favor of Plaintiff and Class members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs, as allowable by law;

C. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

D. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded, reasonable attorney's fees, costs, and expenses as allowable by law; and

E. An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

DATED: June 11, 2026

Respectfully submitted,

/s/ Tina Wolfson

Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Bradley K. King (SBN 274399)
*bking@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177

*Attorneys for Plaintiff and the Proposed Class*